**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GRANT INDUSTRIES, INC., | Civil No.: 21-cv-13094 (KSH) (JBC) |
| *Plaintiff*, | |
| v. | |
| MICHAEL ISAACMAN, STEVEN ISAACMAN, ANDREW MAHON, SYNTHETIC METHODS, LLC, NANOMETICS, LLC, PHD BIOSCIENCES, JOHN DOE INDIVIDUALS 1-10, and JOHN DOE COMPANIES 1-10, | **OPINION** |
| *Defendants*. | |

**Katharine S. Hayden, U.S.D.J.**

I.      **Introduction**

This action arises out of events surrounding the development of a chemical compound used in the personal care and cosmetic industries: a natural, or "green," elastic polymer that the parties refer to as a "green elastomer."  Plaintiff Grant Industries, Inc. asserts that a team of its scientists invented the green elastomer, and that a consultant on the project, Michael Isaacman, his brother, Steven Isaacman, along with the company they work for, defendant PHD Biosciences, also called Nanometics, LLC, and the chief scientific officer of PHD/Nanometics, defendant Andrew Mahon, misappropriated information from Grant and filed patent applications covering the green elastomer.  Grant has asserted a series of contract, tort, and statutory claims against these defendants and against Michael Isaacman's company, Synthetic Methods, LLC. Defendants have now moved to dismiss for lack of personal jurisdiction as to Steven Isaacman, Mahon, and PHD/Nanometics, to transfer the action, and to dismiss multiple claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and 9(b).

## II.     Background

The complaint alleges as follows.  Grant is a private, closely held family business that engages in research, development, manufacturing, and marketing of specialty performance ingredients and describes itself as "a leading global provider to the personal care and beauty industry."  (D.E. 1-1, Compl. ¶ 13.)  Its principal place of business is in Elmwood Park, New Jersey, where it has a 200,000 square foot facility for research and development, manufacturing, warehouse space, and office space.  (*Id.* ¶¶ 1, 14.)  It is "most well-known" for its silicon elastomer gel technology, and specifically for an elastomer product called Polysilicone-11, which it developed in the 1990s and has since become widely used in the cosmetic and personal care industry.  (*Id.* ¶¶ 15-17.)  The company has never sought patent protection for Polysilicone-11 but "has always kept the raw material sources, formula, and process confidential and/or trade secret."  (*Id.* ¶ 18.)  It later developed another elastomer, Stearoxymethicone/Dimethicone Copolymer, for which it was granted a patent in 2001.  (*Id.* ¶ 19.)  The company's elastomer gels are made by combining a silicone elastomer (*e.g.*, either Polysilicone-11 or Stearoxymethicone/Dimethicone Copolymer) with a silicone fluid.  (*Id.* ¶ 20.)  Grant has sold "millions of units" of these gels, which, in the cosmetic and personal care industry, "serve as the formulary base for gels, lotions, creams, balms, foundations, and other products."  (*Id.* ¶¶ 21, 23.)

Around 2010, Grant developed new "hybrid" elastomer gels to address growing market demand for natural products, or "green chemistry."  (*Id.* ¶¶ 24-25.)  Hybrid elastomer gels combine a silicone elastomer with a natural fluid (instead of a silicone fluid).  (*Id.* ¶ 26.)  Although the products were successful, customer demand for a fully natural product prompted the company to pursue inventing "a 100% or completely green Polysilicone-11, bio-based

elastomer gel, and/or natural-based elastomer gel," or a "green elastomer."  (*Id.* ¶¶ 27-28.)  Its research and development team started the project around May 2017 and formalized its concept around September 22, 2017.  (*Id.* ¶¶ 30-31.)  According to Grant, "by September 2017, [it] had independently identified polyurethane chemistry set that would ultimately be the foundation of [certain] patent filings."  (*Id.* ¶ 32.)

The Grant R&D team for this project was comprised of John Gormley, Dr. Ron Lerum, and Dr. Anna Croom (the "Gormley group").  (*Id.* ¶ 33.)  The group is "extensively involved in the research and development of new raw materials from concept to production scale for ingredients in the personal care and cosmetic industries."  (*Id.* ¶ 34.)  According to Grant, the Gormley group's education, expertise, and experience made them "uniquely qualified" for the project, and they were "the true and sole inventors of the . . . green elastomer."  (*Id.* ¶¶ 48-49.)

Dr. Steven Isaacman, Dr. Michael Isaacman, and Andrew Mahon all work for a separate company called PHD Biosciences.  Steven Isaacman founded the company in 2008 and is its CEO.  (*Id.* ¶ 51.)  Michael Isaacman is the director of research and "manages programs to develop novel topical products for drug and non-drug applications."  (*Id.* ¶ 53 (citation omitted).)  Mahon is the chief scientific officer.  (*Id.* ¶ 54.)  Steven had previously acted as a consultant for Grant on different projects, but because he was unavailable at the time, Michael accepted a consulting position with Grant for the green elastomer project.  (*Id.* ¶ 55.)  Beginning around August 2017, Grant paid Synthetic Methods—an entity of which Michael is the "key principal"—a monthly fee of $6,250.  (*Id.* ¶ 56.)  Michael made "numerous presentations" on PHD letterhead.  (*Id.* ¶ 57.)  According to Grant, PHD is a "trade name, division, or business

segment of Nanometics, of which Steven Isaacman is the key principal." (*Id.*)[1]

With Michael serving as a consultant to Grant on the green elastomer project, between 2017 and 2019 Grant disclosed to Steven, Michael, and Mahon "certain confidential information and trade secrets concerning green elastomers (the 'Disclosures')." (*Id.* ¶¶ 58, 60.)  In disclosing the information, Grant purportedly "made explicitly clear that (i) any intellectual property would belong to Grant as well as that Grant would be the sole assignee of any patent or patent application that was filed, and (ii) the Disclosures were contingent on the understanding that the information was confidential and constituted trade secrets belonging to Grant." (*Id.* ¶ 59.) Michael, Steven, and Mahon "acknowledged and accepted" these terms.  (*Id.*)

Ultimately, Michael's presentations were "unsuccessful," his ideas were deemed by Grant to be "unviable," and he failed to produce a viable sample or prototype on his own. (*Id.* ¶¶ 61-63.)  Tension arose in the consulting relationship in other ways as well: around May 2018, Steven complained that Michael's arrangement with Grant, which was intended to be part time, was taking him away from PHD/Nanometics projects and he wanted to hire another employee to cover those projects. (*Id.* ¶¶ 64-66.)  Grant agreed to increase Michael's monthly pay to $8,333 "in exchange for the continued understanding that any intellectual property developed would be

---

[1] The parties appear to agree, at least for purposes of the present motion, that PHD and Nanometics are the same legal entity, and that the claims against them can be treated as though they were asserted against one entity.  Grant adds a caveat: that it does not object to consolidating the claims "so long as Nanometics and PHD Biosciences remain named as [d]efendants," presumably for the purposes of any eventual judgment which may issue in its favor.  (*See* Opp. Br. 4 n.1.)  Given the absence of a dispute over whether PHD and Nanometics comprise one entity, this opinion evaluates the contacts of both named parties – which are referred to herein as PHD/Nanometics – with the forum state together for purposes of the personal jurisdiction analysis.  Likewise, they are treated as one entity in the venue transfer and Rule 12(b)(6) and Rule 9 analyses. The Court expects that the parties will explore this issue in discovery if necessary and submit any clarifications or corrections to the manner in which PHD/Nanometics is named in the lawsuit via a docketed stipulation.  Any disputes in this respect shall be addressed to Magistrate Judge Clark.

the property of Grant and a commitment that he would work at Grant's facilities at least three days a week in support of the Gormley Group on the project." (*Id.* ¶ 67.)  Grant also paid for materials and other expenses at Michael's request.  (*Id.* ¶ 69.)  From August 2017 to August 2019, Grant paid $219,218.63 for Michael's consulting work.  (*Id.* ¶ 70.)

By November 2018, Grant had established a basic process and procedure to produce the green elastomer.  (*Id.* ¶ 71.)  That same month, on November 20, 2018, Steven raised with Grant that he and Grant "would need to determine who would be filing the patent application for the green elastomer." (*Id.* ¶ 72.)  Grant responded that from the outset the parties had clearly agreed that Grant would own the technology and be the only assignee of any resulting patent or patent application.  (*Id.* ¶ 73.)  The next day, it took the position that Michael could not continue working for it without confirming that the project was Grant's intellectual property and that it was to be the sole assignee of any patent application filed.  (*Id.* ¶ 74.)  Michael said he thought his brother Steven was an "opportunist" but that he, Michael, understood the terms.  (*Id.* ¶ 75.)

The issue persisted.  On December 5, 2018, Steven requested a revenue sharing model from Grant for any patent or patent application on the green elastomer.  (*Id.* ¶ 76.)  Grant reiterated its prior position on intellectual property rights.  (*Id.* ¶ 77.)

Six months later, around May 2019, Grant decided to apply for patent protection on the green elastomer in August 2019 and asked Michael to prepare the first draft, which he provided on May 30, 2019.  (*Id.* ¶¶ 79-81.)  Thereafter, Grant worked on the application and on marketing material.  (*Id.* ¶ 82.)  On July 2, 2019, Grant gave Steven an assignment agreement that purportedly "memorialized the parties' understanding." (*Id.* ¶ 83.)  However, Steven "demanded 50% / 50% profit sharing concerning the patent application, and threatened that if Grant refused the proposal, Michael Isaacman would stop all work related to the patent application." (*Id.*)

Grant stood firm, reiterating that what Steven proposed was never contemplated as part of Michael's consulting work.  (*Id.* ¶ 84.)  That same day, Michael left Grant's facility and failed to return, although he did receive and accept his monthly payment for July.  (*Id.* ¶¶ 85-86.)

On July 10, 2019, Steven, Michael, and Mahon filed two provisional patent applications "describing and claiming certain aspects of the green elastomer technology."  (*Id.* ¶ 87.)  The applications, which purportedly disclosed Grant's confidential information and trade secrets and named Steven, Michael, and Mahon as co-inventors, were filed without Grant's knowledge or consent.  (*Id.* ¶¶ 87-88, 94-95, 100.)  The purported co-inventors later assigned their rights with respect to the applications to Nanometics, doing business as PHD Biosciences.  (*Id.* ¶ 94.)  No Grant employees—specifically no one on the Gormley team, *i.e.*, Gormley, Lerum, or Croom, who Grant asserts were the true inventors—were named on the provisional applications.  (*Id.* ¶¶ 97-98.)  Grant asserts that these inventors were omitted intentionally "in order to avoid notice to [it] that [the Isaacmans and Mahon] were filing" the applications, and that the statements of inventorship made in the applications were false, as Steven and Mahon were never involved in developing the green elastomer and Michael's work was "non-inventive and only at the direction and supervision of Grant, for whom he was being paid as a consultant."  (*Id.* ¶¶ 99, 101-02.)  Grant further contends that the patent applications were filed at a time when Michael was working as a consultant for it and being paid by it, with the concomitant obligation to assign any intellectual property rights to Grant.  (*Id.* ¶ 104.)

The next day, Steven emailed Grant stating that defendants "'value our relationship with Grant and look forward to continued work together,'" and suggested various economic models.  (*Id.* ¶ 89.)  Grant posits that this email was pretextual in view of defendants' patent filing the day before.  (*Id.* ¶ 90.)  Grant remitted Michael's August 2019 consulting payment on August 1,

2019.  (*Id.* ¶ 91.)  One week later, on August 8, 2019, Steven told Grant that Michael was no longer working for it; he later returned the August payment.  (*Id.* ¶ 92.)  When Michael stopped his consulting work for Grant, which the company asserts was "[i]n or about August 2019," he took, without the company's consent, "material that included, referenced, and/or was based on the Disclosures, including . . . lab notes and experimental logs."  (*Id.* ¶ 105.)

Defendants later filed another provisional patent application on May 1, 2020, and then on July 10, 2020 they filed a Patent Cooperation Treaty ("PCT") international patent application, which claimed filing priority based on the three provisional applications.  (*Id.* ¶ 106.)  Grant asserts that these applications, like the earlier ones, disclosed its confidential information and trade secrets.  (*Id.*)

Grant learned about defendants' patent applications for the first time around January 14, 2021, when the PCT patent application published—publicly revealing confidential information and trade secrets that Grant provided the Isaacmans and Mahon as part of the Disclosures.  (*Id.* ¶¶ 107, 111.)  Since December 2019, Grant had been marketing its green elastomer in a commercial product, and despite the public nature of this marketing, defendants never sought to have it cease and desist, purportedly because they know that the Gormley group is the "true inventor" and Grant the proper assignee.  (*Id.* ¶¶ 108-10.)

Grant had also filed a provisional patent application for the green elastomer on August 30, 2019 – over a month after defendants surreptitiously filed their initial round of provisional applications.  (*Id.* ¶ 112.)  Grant filed a second application on February 13, 2020.  (*Id.* ¶ 113.)  On August 13, 2020, Grant's provisional applications converted to a utility patent application and a PCT international application; those applications published on March 4, 2021.  (*Id.* ¶¶ 114-15.)  According to the complaint, the timing of the various applications by defendants and Grant

means that Grant "has been and will in the future be forced to cite the Unlawful Isaacman/Mahon Patent Applications against its own proper applications, as potential prior art in various jurisdictions," and that those assertedly improper applications "have hindered, harmed, and will continue to interfere and hinder and harm Grant's ability to obtain patent protection for its green elastomer." (*Id.* ¶¶ 116-17.)

Based on the foregoing sequence of events, Grant has asserted claims against the Isaacmans, Mahon, and the companies involved—Synthetic Methods and PHD/Nanometics: breach of contract by Michael Isaacman and Synthetic Methods, based on the filing of defendants' patent applications (count 1); breach of contract by Michael and Synthetic, based on Michael's alleged misappropriation and use of Grant's confidential and trade secret information (count 2); breach of the fiduciary duty of loyalty by Michael and Synthetic, based on the filing of the patent applications and the misappropriation and use of Grant's confidential and trade secret information (count 3); tortious interference with economic advantage by all defendants, based on the asserted misappropriation, claims of ownership, and the filing of the patent applications (count 4); misappropriation of confidential information and trade secrets by all defendants (count 5); unfair competition by all defendants (count 6); conspiracy by all defendants (count 7); fraud by all defendants (count 8); tortious interference with contractual relations by Steven Isaacman, Mahon, and PHD/Nanometics (count 9); conversion by all defendants (count 10); civil RICO in violation of N.J.S.A. 2C:41-1 *et seq.*, asserted against all defendants (count 11); and unjust enrichment, asserted against all defendants (count 12). Grant also seeks a constructive trust over defendants' patent applications (count 13).

Grant filed its complaint in New Jersey Superior Court, Bergen County, on May 28, 2021. Defendants removed the action to this Court on June 29, 2021, asserting diversity

jurisdiction.  (D.E. 1.)   They have now moved under Rules 12(b)(2), 12(b)(6), and 9(b), as well as 28 U.S.C. § 1404(a), to (1) dismiss the complaint against Steven Isaacman, Mahon, and PHD/Nanometics for lack of personal jurisdiction, (2) transfer this action to the Southern District of New York, and/or (3) dismiss counts 1 and 3 through 12 of the complaint for failure to state a claim.  (D.E. 7.)  In support of the motion, defendants rely on their brief (D.E. 12, Moving Br.), along with declarations of Steven Isaacman (D.E. 9, Steven Decl.), Michael Isaacman (D.E. 10, Michael Decl.), and Andrew Mahon (D.E. 11, Mahon Decl.).  Grant has opposed, relying on its own brief (D.E. 18, Opp. Br.) and the affidavit of Charles Granatell, the personal care director for Grant (D.E. 18-1, Granatell Aff.).  In reply, defendants rely on a brief (D.E. 19, Reply Br.), and additional declarations of Mahon (D.E. 19-1, Mahon Reply Decl.), Steven (D.E. 19-2, Steven Reply Decl.), and Michael (D.E. 19-3, Michael Reply Decl.).  Grant also filed a supplemental affidavit of Marx Pion, a scientist who worked for Grant during the period relevant to this action, in support of its opposition.  (D.E. 23-1, Pion Aff.; D.E. 24.)

## III.    Analysis

### A.  Personal Jurisdiction

Defendants Steven Isaacman, Mahon, and PHD/Nanometics (the moving defendants, for purposes of this jurisdictional discussion) assert that they are not subject to general or specific personal jurisdiction in New Jersey, warranting dismissal of the claims against them under Fed. R. Civ. P. 12(b)(2).  Grant counters that they are subject to specific personal jurisdiction.[2]

#### 1.  Legal Standard

Once a defendant challenges personal jurisdiction, it is plaintiff's burden to prove, by a preponderance of the evidence and with affidavits or other competent evidence, facts sufficient

---

[2] It is undisputed that the Court has jurisdiction over Michael and Synthetic.

to establish personal jurisdiction. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009); *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992). "[W]hen the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a *prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). If the plaintiff makes out a *prima facie* case of personal jurisdiction, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Carteret Sav. Bank*, 954 F.2d at 150 (internal quotation marks and citation omitted).

A federal court may exercise personal jurisdiction over nonresident defendants to the extent authorized by the law of the state in which it sits. In New Jersey, the long-arm statute provides for jurisdiction co-extensive with the limits of due process under the Fourteenth Amendment. *Id.* at 144-45. Due process requires that the defendant have sufficient minimum contacts with New Jersey such that maintaining the suit "does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction comes in two varieties: general, meaning the defendant is subject to suit in the forum state for all causes of action, and specific, meaning the defendant is subject to suit in the forum state because there is a sufficient connection between the defendant's contacts with the forum state and the asserted causes of action. *O'Connor*, 496 F.3d at 317. General jurisdiction requires continuous and systematic contacts with the forum state, while "[s]pecific jurisdiction permits the exercise of personal jurisdiction over [a] non-resident defendant only if

the plaintiff's claims 'arise out of or relate to' the defendant's forum contacts." *Miller Yacht*, 384 F.3d at 101.

### 2. Discussion

Here, Grant concedes the absence of general jurisdiction, arguing instead that Steven, Mahon, and PHD/Nanometics have contacts with this state sufficient for the Court to exercise specific jurisdiction.  Specific jurisdiction is generally determined by a three-part inquiry: (1) whether the defendants "purposefully directed" their activities at the forum (also called purposeful availment); (2) whether the litigation "arise[s] out of or relate[s] to" at least one such activity; and (3) if both of the foregoing requirements are met, whether exercising jurisdiction "comport[s] with fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (citations and internal quotation marks omitted; final alteration in original).  The first two elements address whether a defendant has sufficient minimum contacts with the forum to warrant jurisdiction.  If minimum contacts exist, jurisdiction is "presumptively constitutional" and defeating it requires the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 324 (citation and internal quotation marks omitted).

In contesting jurisdiction, the moving defendants emphasize events that happened outside of New Jersey. (Moving Br. 3-6, 11-13.)[3]  Steven and Mahon argue that there are no allegations that they acted in a way targeted or aimed at this state and that their only alleged misconduct was

---

[3] They also contend that they are not subject to general jurisdiction because their states of residence or domicile are elsewhere, they do not own property or regularly work in or derive income in New Jersey, they have not previously been sued in this state, and as to PHD/Nanometics, that it lacks various indicia of operations here, such as facilities, employees, or bank accounts in the state.  (Moving Br. 7-9.)  As noted earlier, Grant concedes that the Court does not have general jurisdiction over these defendants and accordingly focuses (as will the Court) on whether the moving defendants have contacts with New Jersey that are sufficiently connected to the causes of action asserted against them.

receiving information from Grant and filing patent applications with the U.S. Patent and Trademark Office ("USPTO") in Virginia.  (*Id.* at 12.)  PHD/Nanometics adds that it was not a party to the agreement between Grant, Michael, and Synthetic.  (*Id.* at 13.)  They cite New York as where the agreement was reached, where the parties communicated and had their prior dealings, and where the elastomer was "primarily worked on and developed."  (*Id.*)

In the accompanying declarations, Steven claims that he and PHD/Nanometics "have had various business dealings" with Grant that have in "vast bulk . . . taken place in New York," with "any business arrangements," including license agreements in 2007 and 2008, "generally understood to be governed by New York law."  (Steven Decl. ¶¶ 15-17.)  He also attests that he generally communicated with Grant through the latter's employee Charles Granatell, and that "[w]ith respect to the allegations in Grant's [c]omplaint, virtually all of [his] dealings with Granatell and Grant took place in New York."  (*Id.* ¶¶ 18-19.)  He cites a May 9, 2017 meeting[4] between himself, Michael, and Granatell in New York, regarding "the possibility of collaborating with Grant on a project to synthesize [a] . . . 'green elastomer,'" during which it was purportedly agreed that Michael would work on the project at the PHD/Nanometics lab in New York, Grant would pay Synthetic "to help supplement his salary and underwrite the expense of his research related to the . . . project," and if Michael succeeded, Grant "would have the option to negotiate a license to commercially exploit the green elastomer."  (*Id.* ¶ 20.)

Thereafter, Steven's declaration asserts there were "regular formal and informal internal PHD Biosciences group meetings to discuss [Michael's] progress and troubleshoot any issues" that "generally" took place at the PHD/Nanometics lab or at a restaurant in New York.  (*Id.* ¶

---

[4] After Granatell attested in opposition that no such meeting occurred on that date, noting that he was traveling internationally (Granatell Aff. ¶ 10), Steven responded that he believes the meeting actually took place on May 19, 2017.  (Steven Reply Decl. ¶ 5; *see* Michael Reply Decl. ¶ 6.)

22.)  Steven also cites meetings with Granatell in New York on February 15, 2018, October 9, 2018, and May 8, 2019, during which the project and "profit participation agreement" were discussed; Michael's purported synthesis of the green elastomer in PHD/Nanometics' New York lab; and the preparation of, direction to file, and filing of the patent applications in and from New York to the Virginia office of the USPTO.  (*Id.* ¶¶ 23-27.)  According to Steven, after the agreement about development of the green elastomer was reached, he "rarely, if ever, visited Grant's offices in New Jersey and any time that [he] did it was in [his] capacity at PHD Biosciences."  (*Id.* ¶ 28.)

Michael's declaration adds that "[i]n or around 2017 and 2018, [he] put on various presentations for Grant employees concerning the green elastomer program," initially via telephone conference presented from PHD/Nanometics' New York lab or office and "[o]n a few instances," by traveling to Grant's New Jersey office.  (Michael Decl. ¶ 13.)  He cites meetings with Grant in New York on January 31, 2018, June 30, 2018, November 9, 2018, May 7, 2019, and May 18, 2019.  (*Id.* ¶ 14.)  He contends that the "vast bulk" of his work on the project was done in New York.  (*Id.* ¶ 17.)

Mahon attests that he "rarely, if ever, visited New Jersey" while working at PHD/Nanometics' New York office and lab, and "if [he] did, it was almost exclusively for non-work purposes."  (Mahon Decl. ¶ 5.)  He acknowledges, however, visiting Grant's office in New Jersey on June 7, 2017 "in [his] capacity as an employee of PHD Biosciences to observe a presentation by Michael Isaacman concerning his efforts to synthesize an all-natural replacement for silicone elastomers."  (*Id.* ¶ 10.)  He also acknowledges sending emails to Grant employees and participating in phone calls with them in 2017 and 2018 from New York.  (*Id.* ¶ 11.)

In opposing dismissal, Grant focuses on what *did* happen in New Jersey.  Granatell, the "primary contact" between Grant and defendants "for commercial terms," attests that "on numerous occasions" between 2017 and 2019, "in connection with Michael and Synthetic Methods serving as Grant's consultant, Michael, Steven, and Andrew [Mahon] each visited Grant's New Jersey facilities, where the green elastomer was invented by the Gormley Group." (Granatell Aff. ¶¶ 5-6.)  He asserts that they made presentations on PHD Biosciences letterhead and sent emails and made telephone calls to Grant employees in New Jersey.  (*Id.* ¶¶ 7-9.)  He also cites the following:

- A June 7, 2017 meeting at Grant's New Jersey facility that Steven, Michael, and Mahon attended.  The meeting covered "various topics," including those individuals' desire to have Grant invest in or collaborate on cancer-related projects, and "other natural chemistry topics, including the green elastomer."  (*Id.* ¶ 12.)

- A July 6, 2017 visit by Steven (accompanied by Michael) to Grant's New Jersey facility for a meeting, during which they "made a presentation on PHD Biosciences letterhead"; the meeting and presentation "concerned natural chemistry/the green elastomer."  (*Id.* ¶ 14.)

- Meetings and presentations on August 30, September 13, October 18, and November 8, 2017 by Michael at Grant's facility in New Jersey, during which he used PHD Biosciences letterhead and discussed the elastomer.  (*Id.* ¶¶ 19, 20, 22, 23.)[5]

- A similar meeting and presentation on September 27, 2017 at Grant's facility; the presentation was made by Michael, again on PHD Biosciences letterhead, and

---

[5] Michael states that he participated in these meetings by conference call from PHD Biosciences' New York office and emailed the presentations to Grant beforehand.  (Michael Reply Decl. ¶ 4.)

concerned the elastomer.  Notably, Steven and Mahon also attended this meeting. (*Id.* ¶ 21.)[6]

- A November 30, 2017 meeting at Grant's facility, which was attended by all three individual defendants and involved a presentation on PHD Bioscience's letterhead. Like the earlier meetings and presentations, this one discussed the elastomer.  (*Id.* ¶ 24.)[7]

- The July 2, 2019 meeting between Grant and Steven that was referenced in the complaint; at this meeting, Steven purportedly "demanded 50% / 50% profit sharing concerning the patent application" and threatened to stop Michael's work.  Granatell attests that this meeting took place at Grant's facility in New Jersey, and that Steven (along with Michael) attended it.  (*Id.* ¶ 36; *see also* Compl. ¶ 83.)

Additionally, Granatell's affidavit cites an August 16, 2017 email from Michael forwarding a presentation on PHD Biosciences letterhead and an accompanying conference call, both concerning the elastomer.  (Granatell Aff. ¶ 15.)  He also attests that throughout Michael's provision of services to Grant, Michael sent emails from a PHD Biosciences email address.  (*Id.* ¶ 18.)[8]  Finally, Granatell states that Steven, Michael, and Andrew "were physically present in

---

[6] According to moving defendants, Steven and Mahon attended by phone, not in person.  (Steven Reply Decl. ¶ 4; Michael Reply Decl. ¶ 4; Mahon Reply Decl. ¶ 4.)

[7] Steven contends that he "was not there to discuss the green elastomer project" and that the focus was on other topics.  (Steven Reply. Decl. ¶ 6.)  Mahon makes a similar representation. (Mahon Reply Decl. ¶ 5.)  Michael, while suggesting the "main topics" of the meeting were other subjects, concedes that the elastomer project was discussed.  (Michael Reply Decl. ¶ 5.)

[8] To the extent Granatell points to occasions in January, March, and May 2018 when Michael came to Grant's facility to work on the project (Granatell Aff. ¶¶ 25, 27-30), and to at least 45 occasions on which Michael accessed Grant's facility between December 2018 and June 2019 using his personal 4-digit code (*id.* ¶¶ 31-33), these contacts are not relevant to the minimum

New Jersey when Grant made the disclosures" that form the basis for Grant's various claims. (*Id.* ¶ 35 (citing Compl. ¶¶ 58-60).)

Grant has also submitted an affidavit from Marx Pion, who worked as a research scientist and technical chemist for the company from September 2017 to June 2020.  (Pion Aff. ¶ 2.)  Pion worked under the direction of the Gormley group mostly on projects other than the green elastomer, as to which his work was in an "ancillary capacity."  (*Id.* ¶¶ 6-8.)  He had an "amicable relationship" with Michael and in early August 2019 reached out to him by phone after noticing he had been absent for many weeks.  (*Id.* ¶¶ 9-10.)  Despite the developments in July and August 2019 – including Michael and Steven's confrontation with Grant on July 2 and their subsequent filing of the patent applications, which Pion did not know about – Michael responded to Pion that "he was simply working for Grant off-site for the prior few weeks."  (*Id.* ¶¶ 11-12.)  After giving Pion the impression that he was still working with Grant, Michael asked him for information:

> During the August 2019 Communication, Michael Isaacman asked me to send him pictures of confidential and proprietary lab equipment and set-up details from Grant's New Jersey facility that Grant used in the development of the green elastomer.  Isaacman implied the photographs were to facilitate his alleged off-site work for Grant.

---

contacts analysis for Steven, Mahon, or PHD/Nanometics because Granatell does not connect any of Michael's visits on these occasions with those defendants.

By the same token, however, the moving defendants cannot insulate themselves from the implications of the contacts they, themselves, *did* have with the forum state by invoking the principle that an employer's conduct cannot be imputed to employees.  (Moving Br. 12 n.3; Reply Br. 2.)  They are correct that employees' relevant contacts "are not to be judged according to their employer's activities [in the forum]" (Reply Br. 2 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1983)), but the very next sentence in *Calder* also cautions that "their status as employees does not somehow insulate them from jurisdiction."  *Calder*, 465 U.S. at 790.  Here, the record identifies contacts by each defendant with the forum with sufficient specificity to permit the requisite inquiry, which is that "[e]ach defendant's contacts with the forum State must be assessed individually."  *Id.*

(*Id.* ¶ 14.)  Though finding the request "odd," Pion acquiesced and texted the pictures to Michael. (*Id.* ¶¶ 15-16.)

Rather than engaging in "group pleading" to establish jurisdiction, as moving defendants charge, Grant relies on a factual record that identifies sufficient connections between each of the three moving defendants and the forum.  The foregoing examination of that record, summarized, indicates that Steven visited Grant's facility in New Jersey at least four times during the relevant period and during those visits the parties discussed the development of the green elastomer and the rights to it; in other words, those visits involved the very project and technology underlying Grant's tort, RICO, and unjust enrichment claims and what rights each side had or wanted with respect to the technology.  On at least one other occasion, Steven attended a meeting during which the elastomer was discussed, either at the Grant facility or called into it by telephone; either mechanism qualifies this event as a relevant contact.  *See, e.g.*, *Williams v. Zhou*, 2018 WL 648354, at \*4-5 (D.N.J. Jan. 30, 2018) (McNulty, J.) (purposeful availment requirement met where defendants had one meeting in New Jersey and sent email and correspondence into the state; reviewing case law).

Likewise, Mahon attended meetings on the elastomer's development in New Jersey, in person and/or by phone, and he sent emails to Grant employees in this state.  According to Grant, when these defendants were physically present in New Jersey, Grant made the disclosures of confidential and trade secret materials that the defendants then used to file the allegedly improper patent applications, establishing that it was during the meetings in New Jersey that these (and the other) defendants secured access to the information that they then allegedly misappropriated and converted to their own use.

To the extent moving defendants claim the purpose or focus of some of the meetings described above was on matters other than the elastomer's development, at this stage Grant's version of events, which posits the opposite, is taken as true.  *Miller Yacht Sales*, 384 F.3d at 97. Steven's and Mahon's deliberate contacts with New Jersey through their physical presence at Grant's facility and communications with those present there, which took place over an extended period of time and were connected to an ongoing product development project and business relationship now at issue in this litigation, suffice to meet the purposeful availment requirement. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . or of the 'unilateral activity of another party or a third person'" (citations omitted)); *accord Walden v. Fiore*, 571 U.S. 277, 285-86 (2014).

PHD/Nanometics also has sufficient contacts with the forum.  In addition to the various trips into and communications with Grant personnel in New Jersey by Steven, the company's CEO,[9] in connection with the project, which involved attempts to secure rights to the technology being developed (including a final proposal that an ongoing equal-profit sharing arrangement be put in place), Michael made many presentations on PHD letterhead and used a PHD company email address, giving the appearance that he was acting on behalf of the company, apparently without objection by its CEO, or its chief scientific officer, Mahon, who attended multiple

---

[9] *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) ("Activities of a party's agent may count toward the minimum contacts necessary to support jurisdiction."); *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 380 n. 10 (D.N.J. 2016) (Vazquez, J.) (because individual defendant was employee of corporate defendant at time of acts, "her actions are attributed to [corporate defendant]"; noting that a "corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business") (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 238 (3d Cir. 2001)).

presentations.  Grant has also asserted that Steven and Mahon likewise sent emails "from PHD

Biosciences to employees of Grant in New Jersey."  (Granatell Aff. ¶ 8.)  From a practical

perspective, despite defendants' insistence in their briefing that the relevant agreement existed

solely between Michael, Synthetic, and Grant, it is clear that PHD/Nanometics' principals Steven

and Mahon were heavily involved in communicating with Grant about the project, including

through in-forum meetings and discussions about this project.  Steven, in particular, argued on

multiple occasions, including at an in-person meeting in New Jersey on July 2, 2019, for an

ownership role for PHD/Nanometics in the technology.[10]

The moving defendants' contacts also satisfy the relatedness requirement; *i.e.*, that the

litigation must arise out of or relate to one or more of the contacts that sufficed to show

purposeful availment.  For tort claims, the Third Circuit calls for a "closer and more direct causal

connection than that provided by the but-for test," though there is "no 'specific rule' susceptible

to mechanical application in every case."  *O'Connor*, 496 F.3d at 323.  The inquiry is fact-

specific and "should hew closely to the reciprocity principle upon which specific jurisdiction

rests"— recognizing that each purposeful contact by an out-of-state actor results in benefits

extended and obligations imposed by the forum state and that the connection must be close

---

[10] PHD/Nanometics' involvement in the project is also evident from Steven's own declaration, in which he attests to "regular formal and informal internal PHD Biosciences group meetings to discuss [Michael's] progress and troubleshoot any issues."  (Steven Decl. ¶ 22; *see also* Michael Decl. ¶ 10.)  Although these meetings assertedly took place in New York, their very existence sheds light on the nature of Steven's and Mahon's presence at the meetings in New Jersey with Grant when Michael was discussing the elastomer project.

It is also fair to infer that in 2019, when Michael sought from Marx Pion, then a Grant employee, pictures of and details about the lab setup in New Jersey, he was acting at least in part for the benefit of PHD/Nanometics.  (Pion Aff. ¶¶ 14-16.)  By then, according to the complaint, defendants had already filed the first two patent applications unbeknownst to Grant, with the three individual defendants listed as co-inventors.  (Compl. ¶¶ 87, 93.)  They ultimately assigned their rights in the applications to PHD/Nanometics.  (*Id.* ¶¶ 94-96.)

enough to make personal jurisdiction "reasonably foreseeable." *Id.  Accord Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020) ("The defendant must have benefited enough from the forum state's laws to make the burden of facing litigation there proportional to those benefits."); *see also Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) ("For the contacts to satisfy the second prong, there must be "a strong 'relationship among the defendant, the forum, and the litigation.'" (quoting *Ford Motor Co. v. Montana Eighth Judicial District Court*, __ U.S. __, 141 S. Ct. 1017, 1028 (2021)).[11]

Here, the claims in question are sufficiently connected to the contacts between those defendants and the forum such that personal jurisdiction was "reasonably foreseeable."[12]  The

---

[11] In *Ford*, the Supreme Court rejected a standard that would require a causal nexus in order for a claim to "arise out of or relate to" a defendant's forum contacts, holding that the "relate[s] to" language "contemplates that some relationships will support jurisdiction without a causal showing." 141 S. Ct. at 1026; *see also id.* at 1028 ("exclusively causal test of connection" is "inconsistent with [Court's] caselaw"). In *Hepp*, the Third Circuit quoted the Supreme Court's "strong relationship" language, but did not confront whether the standard it set forth for relatedness in *O'Connor* (and in particular, *O'Connor's* causation-based standard) continues to be viable. 14 F.4th at 208. District courts in this circuit have reached different conclusions. In *Rickman v. BMW of North America, LLC*, for example, Judge McNulty concluded that "the Third Circuit's causation requirement cannot be reconciled with *Ford*." 538 F. Supp. 3d 429, 441 (D.N.J. 2021). In *Keystone Drill Services, Inc. v. Davey Kent Inc.*, Judge Gibson concluded that *Ford* did not overrule the Third Circuit's causation test and instead held that there are two ways for claims to "arise out of or relate" to contacts – "arising out of" calls for a causal nexus, while "relating to" calls for a "strong relationship among the defendant, the forum, and the litigation." 2022 WL 819280, at *11-12 & n. 6 (W.D. Pa. Feb. 22, 2022). Here, the moving defendants' contacts satisfy both the causation standard in *O'Connor* and the "strong relationship" test of *Ford*.

[12] Although the "usual practice" is to determine specific jurisdiction on a claim-by-claim basis, "'it may not be necessary to do so' for certain factually overlapping claims." *O'Connor*, 496 F.3d at 317 n. 3 (quoting *Remick v. Manfredy*, 238 F.3d 248, 255-56 (3d Cir. 2001)).  Here, the claims the moving defendants challenge as to specific jurisdiction stem from the same sequence of events and factual allegations. *Cf. Remick*, 238 F.3d at 256-60 (analyzing jurisdiction for claims separately where they were based on different factual allegations); *see also M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 496-97 (E.D. Pa. 2021) ("We need not conduct a separate jurisdictional analysis for each intentional tort when each tort is based on the same or similar allegations.").

moving defendants' presence in New Jersey through communications sent into the state and their physical visits here gave them access to confidential, proprietary information from a New Jersey business that, according to Grant, they then used for their own benefit in seeking patent protection.  During those contacts they learned that Grant expected to be the only assignee of any follow-up patent applications and that it expected defendants to keep the information confidential.  Defendants' allegedly improper patent applications were later published, revealing Grant's confidential information publicly and potentially limiting the patent protection available to Grant and therefore its ability to compete with respect to the product.  (Compl. ¶¶ 111, 116-17.)  Steven sent an email into the forum stating that defendants "'value[d] [their] relationship with Grant and look[ed] forward to continued work together'" *the day after* the patent applications were filed, from which an improper motive can be inferred.  (*Id.* ¶ 89.)  That course of conduct forms the basis for Grant's claims and is closely connected to the forum.  *See Miller Yacht Sales*, 384 F.3d at 95-96 (reversing dismissal for lack of personal jurisdiction where defendants, in course of ultimately failed negotiations over marketing and licensing deal, made phone calls and sent faxes into New Jersey and traveled to plaintiff's New Jersey office, and during one such trip, plaintiff provided defendants with photos and floor plans that defendants later misappropriated and used to produce and market competing products).  Accordingly, Grant has established a *prima facie* case of jurisdiction.[13]

---

[13] The moving defendants' contacts also satisfy the *Calder* effects test applicable to intentional torts, which requires the defendant to have "'expressly aimed [its] tortious conduct at the forum' to make the forum 'the focal point of the tortious activity,'" and for the plaintiff to have "'felt the brunt of the harm in the forum.'"  *Danziger*, 948 F.3d at 130 (quoting *Imo Industries*, *Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998)).  Here, the intentional tort claims are premised on defendants' misappropriation of Grant's confidential information and trade secrets.  (Compl. ¶¶ 139, 152, 178.)  Grant's principal place of business is located in New Jersey, as are its trade secrets.  *See Vital State Canada, Ltd. v. DreamPak, LLC*, 303 F. Supp. 2d 516, 520 (D.N.J. 2003) (Greenaway, J.).  Accordingly, the moving defendants expressly aimed their misappropriation at

The final step of the specific jurisdiction analysis is whether "the exercise of jurisdiction would otherwise comport with 'traditional notions of fair play and substantial justice.'" *O'Connor*, 496 F.3d at 324 (citation omitted).  Jurisdiction is at this point presumptively constitutional, and moving defendants have failed to present a "'a compelling case that that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (citation omitted); *see also id.* (describing defendant's burden as "'heavy'" (quoting *Grand Entm't*, 988 F.2d at 483)).  Relevant considerations are "'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate . . . judicial system's interest in obtaining the most efficient resolution of controversies[.]'" *Id.* (quoting *Burger King*, 471 U.S. at 477).

The moving defendants do not, and credibly cannot, contend that litigating in this state places an unwarranted burden on them.  They have offered no suggestion of the sort, and instead seek to have the case venued in the nearby Southern District of New York, where only one defendant remains resident.  The other two moving defendants are domiciled in California—but do not object to litigating in New York.  The Court cannot discern how or why litigating in New York, versus New Jersey, for California domiciliaries would present any materially different or lesser burden, especially not in view of defendants' choice regularly to enter this state as part of a business opportunity that appeared promising and beneficial to them.  Moving defendants have failed to show how litigating elsewhere would effectuate a more efficient resolution of this controversy or how another state's interest would be greater than New Jersey's.  On the other

---

New Jersey, and Grant necessarily felt the brunt of the harm there.  *See Eddie Kane Steel Prod., Inc. v. Alabama Plate Cutting Co.*, 2019 WL 3281623, at *6 (D.N.J. July 19, 2019) (Shipp, J.) ("[I]f a defendant steals trade secrets from a plaintiff, the defendant expressly aims his or her tortious activity where the plaintiff resides, and the plaintiff has felt the brunt of the harm in that state.").

hand, New Jersey and Grant, a New Jersey company allegedly injured here, both have a clear interest in having the dispute litigated here. *See, e.g.*, *Opheim v. Aktiengesellschaft,* 2021 WL 2621689, at *6 (D.N.J. June 25, 2021) (McNulty, J.) ("New Jersey has an interest in giving its residents a forum to vindicate their legal interests for injuries occurring here."). The moving defendants present no "compelling case" that jurisdiction would be unreasonable here.

The Court is satisfied that it has specific jurisdiction over moving defendants, and their motion to dismiss on jurisdictional grounds is denied.

### B. Venue

#### 1. Legal Standard

Defendants also seek to transfer venue to the Southern District of New York under 28 U.S.C. § 1404(a), under which a court may, "[f]or the convenience of parties and witnesses, in the interest of justice," transfer a civil action to any other district in which it might have been brought. *Id.* It is the movant's burden to show the need for transfer. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) (citations and internal quotation marks omitted). It bears emphasis that "the plaintiff's choice of venue should not be lightly disturbed," *id.* (citations and internal quotation marks omitted), and that the "'motion must not be lightly granted,'" *Westfield Ins. Co. v. Interline Brands, Inc.*, 2013 WL 6816173, at *14 (D.N.J. Dec. 20, 2013) (Simandle, J.) (citation omitted). *See also MaxLite*, 193 F. Supp. 3d at 392 (burden is on movant to "'show the proposed forum is not only adequate, but also more convenient than the present forum'" (citation omitted)). On the whole, the Court has "broad discretion" in determining whether the relevant "convenience and fairness considerations" favor transfer. *Jumara*, 55 F.3d at 883.

As a threshold matter, a venue transfer requires the transferee forum to be one in which the action "might have been brought," an inquiry that would examine venue and jurisdiction in

that proposed forum. *Hoffman v. Blaski*, 363 U.S. 335, 34344 (1960).  Neither side addresses

this question with precision, but assuming *arguendo* the Southern District of New York would

qualify, courts in this circuit proceed to consider a prescribed list of private and public factors,

including but not limited to the three statutorily enumerated ones (convenience of the parties,

convenience of the witnesses, and the interests of justice). *Jumara*, 55 F.3d at 879.  The private

interest factors include the following:

> [1] plaintiff's forum preference as manifested in the original choice, [2] the
> defendant's preference, [3] whether the claim arose elsewhere, [4] the convenience
> of the parties as indicated by their relative physical and financial condition, [5] the
> convenience of the witnesses—but only to the extent that the witnesses may
> actually be unavailable for trial in one of the fora, [6] and the location of books and
> records (similarly limited to the extent that the files could not be produced in the
> alternative forum)[.]

*Id.* (citations omitted).  The public interest factors include the following:

> [1] the enforceability of the judgment, [2] practical considerations that could make
> the trial easy, expeditious, or inexpensive, [3] the relative administrative difficulty
> in the two fora resulting from court congestion, [4] the local interest in deciding
> local controversies at home, [5] the public policies of the fora, [6] and the
> familiarity of the trial judge with the applicable state law in diversity cases[.]

*Id.* at 879-80 (citations omitted).  Here, these factors warrant denying defendants' request to

transfer venue.

### 2.  Discussion

#### a.  Private Interest Factors

Grant's interest is to litigate in its home state.  As noted earlier, that interest is not to be

"lightly disturbed."  *See also, e.g.*, *Coyoy v. United States*, 526 F. Supp. 3d 30, 46 (D.N.J. 2021)

(McNulty, J.) (plaintiff's forum choice "is 'entitled to greater deference when a plaintiff chooses

[its] own home forum'" (quoting *Alvarado v. United States*, 2017 WL 2303758, at *6 (D.N.J.

May 25, 2017)).

Against that interest, defendants cite their own preference to litigate in the Southern District of New York, an interest they contend is bolstered by the number of events relevant to this action that assertedly occurred in New York.  Relatedly, they argue that the third factor, where the claim arose, favors transfer.  But these assertions suffer from the same problem as defendants' arguments against personal jurisdiction in New Jersey: they ignore what events *did* happen here and their relationship to Grant's causes of action.  For example, beyond the meetings, presentations, and disclosures made in New Jersey (disclosures that, according to Grant's version of events, made it possible for defendants to carry out the misconduct attributed to them), Grant has alleged that the Gormley group working in New Jersey at Grant, and not Michael working at PHD/Nanometics' lab, invented the green elastomer—an event key to Grant's multiple tort claims.  (*E.g.*, Compl. ¶¶ 33-49, 61-63; Granatell Aff. ¶ 6.)[14]

Although defendants correctly recognize that a plaintiff's forum choice is weighed less heavily when significant aspects of the dispute occurred elsewhere, they overstate the effect of that principle here.  While courts "do often give less weight to the plaintiff's forum choice if the events of the suit occurred almost *exclusively* in another forum," that is not necessarily so where "[n]umerous important events" take place in the forum state.  *Coyoy*, 526 F. Supp. 3d at 45-46 (noting that in view of events that did happen in New Jersey, it was "thus not true that this district has 'little connection with the operative facts of the lawsuit . . . or that 'the nucleus of operative facts is outside' New Jersey" (citations omitted)).  Here, the activity alleged to have

---

[14] Defendants also cite a "course of conduct" between the parties whereby their dealings were governed by New York law.  The 2007 and 2008 agreements are discussed in the moving papers in vague terms that fail to connect them in any meaningful way to the project at the heart of the current dispute. Moreover, defendants' discussion of where the contract claims arose is based on a very different version of the agreement from the one alleged in the complaint, and only two of the twelve substantive counts are contract claims.

taken place in New Jersey is sufficiently robust that these private interest factors fail to overcome Grant's forum preference.

The remaining private interest factors likewise favor keeping venue here.  As to the parties' relative physical and financial conditions, defendants argue that Grant is a far larger company with more resources, but they fail to explain why having to litigate in New Jersey would be materially less convenient or more burdensome for them than New York, particularly given PHD/Nanometics', Mahon's, and Michael's move in 2020 to California—where they remain.  (Michael Decl. ¶¶ 2, 5; Mahon Decl. ¶¶ 3, 6.)  Defendants also contend that New York would be a more convenient forum for several potential witnesses, without addressing the critical question of whether they "may actually be unavailable for trial" in New Jersey.  *Cf. Jumara*, 55 F.3d at 879 (convenience of witnesses is considered, "but only to the extent that the witnesses may actually be unavailable for trial in one of the fora.").  Indeed, many of the potential witnesses aside from defendants themselves are *Grant* employees, [15] and defendants offer no analysis of whether those witnesses would be available for trial in a New York forum beyond suggesting that two of them may live in New York.  (Michael Decl. ¶¶ 14-15.)

The location of the books and records likewise does not help defendants, as there is no indication that records would be available in New York but not in New Jersey.  Again, defendants concede that PHD/Nanometics' offices and labs relocated from New York to California in 2020, along with Michael and Mahon; there is no suggestion that relevant materials

---

[15] In fact, one of the three witnesses they cite, Anna Croom, works for Grant, making it unlikely that her alleged residence in New York would make her unavailable for a New Jersey trial. Moreover, while defendants contend that "key witnesses" Mahon and Steven, both of whom are California residents, would not "object" to a venue transfer to the Southern District of New York, the Court has already concluded that they are subject to personal jurisdiction in this forum and a venue transfer determination cannot be left to the whims of where a potential witness would prefer to appear.

remain in New York.  Moreover, "in the age of electronic discovery it is hard to imagine that [defendants] cannot produce relevant documentary evidence in New Jersey, and [they] certainly [have] not claimed (much less shown) that [they] cannot do so." *MaxLite*, 193 F. Supp. 3d at 394.

### b.  Public Interest Factors

In addressing the public interest factors, defendants argue that the Court lacks personal jurisdiction over some defendants or that its jurisdiction is doubtful, which could lead to multiple actions, the risk of inconsistent judgments, and judgment enforceability issues absent transfer. As the Court has earlier concluded that it has personal jurisdiction over all of the defendants, these concerns are not implicated.  Likewise, defendants' contention that New York has a greater interest because, essentially, this is a New York-based controversy is based on their own framing of the dispute, not the one pleaded in Grant's complaint.  Grant is a New Jersey business that alleges that its confidential business information was improperly taken from it in New Jersey; at least several significant aspects of the challenged events happened here, giving rise to a sufficiently local controversy for New Jersey to have a policy interest in resolving it.  *See, e.g.*, *Fernandes v. Deutsche Bank Nat'l Tr. Co.*, 157 F. Supp. 3d 383, 391 (D.N.J. 2015) (Simandle, J.) ("[B]ecause this action concerns tortious conduct that allegedly occurred in this State, New Jersey possesses a significant public policy interest in resolving this dispute.").

As to the remaining factors, neither party addresses them.  Briefly, there is no indication that the Southern District of New York's docket is materially less congested than this Court's, and in any event this factor has "minimal importance in the overall transfer inquiry." *Fernandes*, 157 F. Supp. 3d at 391.  The final factor, examining the trial judge's familiarity with the applicable state law, is also neutral.  Grant has asserted a series of mostly contractual and

common law tort claims, along with a statutory RICO claim, under New Jersey law.  Defendants

contend that New York law should apply.  In either event, any eventual choice of law analysis

"likely will have to reckon with both New Jersey and [New York] law to determine whether a

conflict between the two states' laws exists."  *Yocham v. Novartis Pharms. Corp.*, 565 F. Supp.

2d 554, 559 (D.N.J. 2008) (Simandle, J.).  As a practical matter, "federal district courts are

regularly called upon to interpret the laws of jurisdictions outside of the states in which they sit."

*Id.* at 560.

Having considered and balanced the public and private interest factors, the Court

concludes that transfer of this matter to the Southern District of New York is not warranted.

### C.  Failure to State a Claim

Finally, defendants move to dismiss counts 1 and 3 through 12 for failure to state a claim

under Fed. R. Civ. P. 12(b)(6) and 9(b).  Grant counters that all counts have been adequately

pleaded.  The parties also dispute the applicable law, with defendants asserting that New York

law applies and Grant that New Jersey law governs.  That dispute need not be resolved now.

Defendants themselves concede that there is no conflict between New Jersey and New York law

on the claims or doctrines at issue in this motion, with the exception of the RICO claim, and that

therefore the law of New Jersey, the forum state, appropriately applies in ruling on the motion.

With respect to the RICO claim, as will be explained *infra*, it fails under either state's law.

#### 1.  Legal Standard

Under Fed. R. Civ. P. 8(a)(2) pleadings must contain "a short and plain statement of the

claim showing that the pleader is entitled to relief."  Detailed factual allegations are not

necessary, though the complaint must contain "more than an unadorned, the-defendant-

unlawfully-harmed-me accusation," and "'a formulaic recitation of the elements of a cause of

action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007)).  To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning the plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 570).  The burden is on the movant to show that the plaintiff has not adequately pleaded its claims.  *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 272 n. 14 (3d Cir. 2016)

Rule 9(b) sets forth pleading requirements for fraud claims.  It requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." In practice, it necessitates that a plaintiff alleging fraud "support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).  *See also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (to meet particularity requirement, plaintiff must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation").

### 2.  Discussion

#### a.  Economic Loss Doctrine

As an initial matter, defendants assert that counts 3 through 11 are barred by the economic loss doctrine.  In practice, that doctrine's application is more nuanced than simply providing that no tort claim can be asserted when a contract claim is brought.  Although as a

general matter it aims to "draw[] a clear line between remedies available in tort and contract," *Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 305 (2010), contract and tort claims can coexist when, in addition to the contractual obligations, "the breaching party owes an independent duty imposed by law," *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002). This requires careful examination of the manner in which the plaintiff has pleaded its claims, an inquiry more appropriately undertaken in the specific context of each claim challenged on the basis of this doctrine. Moreover, as Grant has noted and defendants appear to concede (*see* Reply Br. 7-8), no contract claims are pleaded against PHD/Nanometics, Steven, or Mahon, meaning the purposes of the doctrine are not implicated as to them. *See SRC Const. Corp. of Monroe v. Atl. City Hous. Auth.*, 935 F. Supp. 2d 796, 799-801 (D.N.J. 2013) (Irenas, J.) (in the typical economic loss doctrine case, a tort claim is foreclosed "not simply because a contract claim exists, but rather, that the tort claim is not really a tort claim at all; it is a contract claim in tort claim clothing . . . . But where there is no direct contractual relationship between the plaintiff and defendant, frequently there can be no contract claim at all, and therefore any tort claim asserted cannot possibly be a contract claim in tort clothing"); *Svigals v. Lourdes Imaging Assocs., P.A.*, 2018 WL 6178863, at *4 (D.N.J. Nov. 27, 2018) (Hillman, J.) ("The purpose of the economic loss doctrine, in part, is to prohibit plaintiffs from using tort law to alter contractual remedies or to replace a breach of contract action. That purpose is not implicated where parties are not in contractual privity." (citation omitted)).

With these principles in mind, the Court will address the applicability of the economic loss doctrine on a claim-by-claim basis, and only as to Michael and Synthetic.[16]

---

[16] Count 9 (tortious interference with contract) is not asserted against Michael/Synthetic and is only challenged by defendants on economic loss grounds. Accordingly, the Court will not dismiss it.

### b.  Count 1: Breach of Contract

Defendants contend that count 1 should be dismissed because Grant failed to plead that it performed its own obligations under the relevant agreement, an essential element of a breach of contract claim.  That is incorrect: the complaint pleads that the contract between Grant and Michael/Synthetic required Grant to pay Michael a consulting fee, and that it paid that fee. (Compl. ¶¶ 56, 67-70, 121.)  Confronted with this response in Grant's opposition brief, defendants continue to insist in reply that Grant did not allege it performed "all" of its obligations, but fail to explain what other obligations Grant had under the agreement it alleged in the complaint.  The motion to dismiss is denied as to count 1.

### c.  Count 3: Breach of Fiduciary Duty

Defendants argue that Grant's claim against Michael and Synthetic for breach of the fiduciary duty should be dismissed because the complaint fails to adequately plead the existence of a fiduciary relationship, citing cases discussing a fiduciary relationship as one arising from a power imbalance between a party in a dominant position or with superior power over the other party and contrasting them with situations involving arms-length commercial relationships. Here, however, Grant has articulated a claim for breach of the fiduciary duty of *loyalty*, with the asserted duty arising from the nature of the relationship created by the consulting arrangement with Michael and Grant's expectation, allegedly expressed on multiple occasions, that its disclosures in the course of the relationship were to be maintained confidentially and that it was to retain all ownership of the results of the elastomer project.[17]  Whether the facts ultimately

---

[17] Because in this type of claim, the relevant contract, such as an employment or consulting agreement, can aid in defining the parameters of the duty, *see Lamorte*, 167 N.J. at 305, defendants' economic loss doctrine argument—that the existence of a contract precludes the assertion of this tort claim—ill fits the circumstances.  For the same reason, the Court will not dismiss the misappropriation (Count 5), unfair competition (Count 6), and conversion (Count 10)

support Grant's theory of liability and whether the rubric in the cases Grant cites in opposing

dismissal is appropriate for these facts are matters for decision on a more developed factual

record.  For present purposes, Grant has articulated its claim adequately to survive the motion to

dismiss count 3.

### d.  Count 4: Tortious Interference with Economic Advantage

Defendants argue that Grant insufficiently pleaded its expectation of economic advantage

(the first element of the claim) because it did not identify which anticipated contracts or

customers it expected to gain.  Grant, in response, points to its complaint allegations that it "has a

history of successfully commercializing products that are both held as trade secrets and patented

inventions" and that "[i]n response to customer feedback and further market demands, [it] sought

to invent" the green elastomer.  (Opp. Br. 32 (citing Compl. ¶¶ 22, 28).)  The complaint also

alleges that Grant has, since December 2019, been "publicly marketing its green elastomer

invention in a commercialized product."  (Compl. ¶ 108.)  Considered in the context of the

complaint as a whole, these allegations amount to more than a "mere allegation of lost business."

*Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 494 (D.N.J. 1998) (internal citations and

quotations omitted).  In addition to asserting that the green elastomer was developed in response

to customer and market demand, the complaint describes Grant as a longstanding industry-

leading supplier of silicone elastomer gels.  (Compl. ¶¶ 15-19, 21, 23, 25.)  It can reasonably be

---

claims on economic loss grounds.  *See Trico Equip., Inc. v. Manor*, 2011 WL 705703, at *3, 5
(D.N.J. Feb. 22, 2011) (Kugler, J.) (applying economic loss doctrine to bar misappropriation and
unfair competition claims after analyzing language in confidentiality agreement and restrictive
covenants); *see also Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 682 (D.N.J. 2012) (Irenas,
J.) (declining to apply economic loss doctrine to conversion claim because "Plaintiffs allege[d]
that Defendant misappropriated funds in ways not contemplated by the contract.").

inferred that Grant embarked on the elastomer project in response to specific customer interest and invested resources into that project with the expectation of satisfying that demand.

Although defendants cite numerous cases requiring a plaintiff to identify at least one affected relationship, which Grant has not done, Grant counters with other case law holding exactly the opposite. *Compare Canfield Sci., Inc. v. Melanoscan, LLC*, 2017 WL 2304644, at *5-6 (D.N.J. May 25, 2017) (Vazquez, J.) (plaintiff must allege "'specific prospective contracts that were interfered with'"; citing cases) *with Heartland Payment Sys., LLC v. Carr*, 2021 WL 302918, at *7 (D.N.J. Jan. 29, 2021) (Martinotti, J.) ("[a]t the pleading stage, 'a plaintiff does not need to allege specific prospective customers or contracts to show a reasonable expectation of prospective economic benefit'"; citing cases).  There is enough in this complaint to permit this claim to proceed to discovery.[18]

### e.  Count 7: Conspiracy

Defendants also seek dismissal of the conspiracy claim.  In addition to pleading the existence of an actionable tort which, as evidenced *supra*, has occurred here, a plaintiff asserting a conspiracy cause of action must plead: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages."

---

[18] Additionally, Grant's claim appears to be premised on defendants' unlawful interference with its economic advantage *irrespective of* its contract with Michael and Synthetic.  *See D & D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, 2012 WL 1079583, at *35 n. 15 (D.N.J. Mar. 30, 2012) (Cooper, J.), *aff'd,* 552 F. App'x 110 (3d Cir. 2014) (tortious interference with prospective economic advantage claim not barred by economic loss doctrine because it was "extrinsic to the contracts at issue").  The Court also sees no requirement that it dismiss the claim for impermissible "group pleading," as the allegations are sufficient at this early juncture to tie each defendant to Grant's purported economic loss.

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003).

Here, Grant has alleged that two or more persons used "Grant's confidential information, trade secrets, and intellectual property" to prepare and file patent applications "unlawfully and without [its] knowledge or consent," which speaks to an unlawful purpose.  (Compl. ¶ 87, 160.) It has further alleged that the applications listed Michael, Steven, and Mahon as "co-inventors" and "assigned all rights in the application to Nanometics doing business as PHD Biosciences," suggesting a concrete "agreement" among defendants to "depriv[e] Grant of its intellectual property and ability to obtain a patent concerning the green elastomer."  (*Id.* ¶¶ 94-96, 161.)[19]  Of more concern is the complaint's barebones allegation that Grant "has been deprived of its intellectual property and the economic benefits therefrom" (*see* Compl. ¶ 163), which on its face is insufficient to establish "special damages."  *See Karachi Bakery India v. Deccan Foods LLC*, 2017 WL 4922013, at *11 (D.N.J. Oct. 31, 2017) (Vazquez, J.) (allegation that defendants "conspired to deprive Plaintiff of its exclusive rights" to a trademark was insufficient to plead "special damages" and lacked the requisite specificity under Fed. R. Civ. P. 9); *cf. Iron Bar, LLC v. Dougherty*, 2021 WL 363706, at *11 (D.N.J. Feb. 3, 2021) (Arleo, J.) (civil conspiracy claim survived motion to dismiss where plaintiffs alleged "ten distinct categories of damages flowing from the conspiracy," including lost profits and additional expended resources).  Unlike general damages, which are "implied or presumed by the law," special damages are "the natural, but not the necessary, consequence of the act complained of"; accordingly, they must be "specifically pled" so as "to give notice to the other side" of the damages alleged.  *Delzotti v. Morris*, 2015

___

[19] In light of the allegations tying the various defendants to the conspiracy, defendants' "group pleading" argument lacks merit.

WL 5306215, at *8 (D.N.J. Sept. 10, 2015) (Simandle, J.) (internal citations and quotations omitted).  That did not occur here.

Despite this defect, the complaint as a whole includes indicia of damages beyond those pled in paragraph 163.  Grant's conspiracy claim is thus dismissed without prejudice to replead special damages.

### f.   Count 8: Fraud

To assert a common law fraud claim, a plaintiff must plead: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  *Pro. Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 166 (3d Cir. 2007) (internal citations and quotations omitted).  And, as explained *supra*, the pleadings are subject to Rule 9(b)'s heightened pleading requirements.  *See Frederico*, 507 F.3d at 200.

Here, Grant alleges that Michael, Steven, and Mahon, personally and on behalf of Synthetic and PHD/Nanometics, "on numerous occasions from in or about 2017 through in or about 2019" represented that "any intellectual property would belong to Grant as well as that Grant would be the sole assignee of any patent or patent application that was filed" and recognized that the information they received from Grant "was confidential and constituted trade secrets belonging to Grant."[20]  (Compl. ¶¶ 58–60, 168.)  It further alleges that defendants knew their representations to be false and made them with the purpose of inducing Grant's reliance.

---

[20] Despite the parties' conflicting case law, the Court is satisfied that these allegations adequately plead a material misrepresentation of "presently existing" fact. *See Stochastic Decisions, Inc. v. DiDomenico*, 236 N.J. Super. 388, 396 (App. Div. 1989) (recognizing that misrepresentation "may consist of a present intention to act or not act in the future"); *accord Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 452, 457 (App. Div. 1985).

(*See id.* ¶¶ 168–70.)  Injecting the required specificity into those allegations, Grant has provided

details regarding a series of conversations between Grant and Michael/Steven that occurred in

November and December 2018 and early July 2019 during which Grant repeatedly made known

the parties' agreement regarding Grant's intellectual property and future patent applications,

Steven sought to renegotiate his position, and Michael acknowledged the parties' agreement and

his intent to abide by its terms.[21]  (*See id.* ¶¶ 72-77, 83-85.)  It further alleges that despite these

conversations, Michael, Steven, and Mahon filed two patent applications without Grant's

knowledge or consent on July 10, 2019 and, the next day, Steven sent an email to Grant

indicating that defendants "'value[d] [their] relationship with Grant and look[ed] forward to

continued work together.'"  (*See id.* ¶¶ 87-90.)  Yet less than one month later, on August 8, 2019,

Steven notified Grant that Michael would no longer be working for it.  (*Id.* ¶ 92.)

      Taken as a whole, these allegations are injected with the type of "who, what, when,

where and how" details required under Rule 9(b).  *See United States ex rel. Moore & Co.*, 812

F.3d at 307.  The motion to dismiss is denied as to count 8.

### g.  Count 11: New Jersey RICO

      Under New Jersey law,[22] it is "unlawful for any person employed by or associated with

any enterprise engaged in or activities of which affect trade or commerce to conduct or

participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of

---

[21] Although the fraud claim is based in part on the underlying contract between Grant and
Michael/Synthetic, defendants' misrepresentations appear to go beyond its terms.  Accordingly,
dismissal on economic loss grounds is unwarranted.  *See Touristic Enterprises Co. v. Trane Inc.*,
2009 WL 3818087, at *3 (D.N.J. Nov. 13, 2009) (Chesler, J.) (rejecting economic loss doctrine
argument where fraud claim was premised on conduct not covered by contract).

[22] New York's RICO statute does not appear to contain a provision permitting a private cause of
action.  *See* N.Y. Penal Law §§ 460.00-460.80.

racketeering activities or collection of unlawful debt." N.J.S.A. 2C:41-2(c). To assert a cause of action under New Jersey RICO, a plaintiff must demonstrate: "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy." *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 674 (D.N.J. 2015) (Martini, J.).

While the conspiracy count may go forward (if appropriately amended) for the reasons stated, the Court is unconvinced that Grant's RICO allegations should survive. As a preliminary matter, Grant has failed to plead the existence of an "enterprise," which is defined in New Jersey RICO to include "any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, [and] any union or group of individuals associated in fact although not a legal entity." N.J.S.A. 2C:41-1(c). Grant has generally announced the existence of various enterprises – Synethics, Nanometics, and PHD Biosciences – and also that they operated as a "single enterprise" with the assistance of Michael, Steven, and Mahon. (*See* Compl. ¶¶ 186-92.) However, it has done so in a conclusory fashion that fails to plausibly demonstrate how the purported members of the enterprise(s) related to and functioned with each other such that they formed an associated unit. *See Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 675 (D.N.J. 2015) (Martini, J.) (recognizing that existence of an enterprise requires "some sort of framework for making or carrying out decisions") (quoting *United States v. Irizarry*, 341 F.3d 273, 286 (3d Cir. 2003)); *accord State v. Ball*, 141 N.J. 142, 162 (1995) (finding that the "distinguishing marks" of an enterprise are "[t]he division of labor and the separation of functions undertaken by the participants").

Moreover, Grant has failed to plead or explain in its opposition brief how the predicate conduct—namely, "fraud and theft of trade secrets" (*see* Compl. ¶ 194)—qualifies as "racketeering activity" under N.J.S.A. 2C:41-1(a). *See Delzotti*, 2015 WL 5306215, at *7 (dismissing New Jersey RICO claim where plaintiff failed to identify in complaint "how the predicate conduct of fraudulent conveyance qualifie[d] as 'racketeering activity'" under statute). As well, the complaint fails to allege a "pattern" of racketeering, which is defined in New Jersey RICO as: (1) "[e]ngaging in at least two incidents of racketeering conduct . . . within 10 years"; and (2) "[a] showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. 2C:41-1(d). Only one paragraph appears to get to the point, which is the conclusory statement that defendants "participated in a pattern of racketeering activity . . . intended to deprive Grant of its confidential information and trade secrets, its intellectual property and the economic benefits therefrom." (*See* Compl. ¶ 194). This is manifestly insufficient and does not reflect facts showing that defendants engaged in at least two interrelated predicate acts with a common purpose. *See Zanger v. Bank of Am., N.A.*, 2011 WL 3501867, at *6 (D.N.J. Aug. 10, 2011) (Kugler, J.) (dismissing New Jersey RICO claim where plaintiff failed to allege with requisite specificity at least two predicate acts constituting a "pattern" of racketeering).

At most, Grant has alleged an isolated scheme against a single victim—not a continuous "pattern" of racketeering which New Jersey RICO is designed to address and sanction harshly. *See Leeder v. Feinstein*, 2019 WL 2710794, at *9 (D.N.J. June 28, 2019) (Martinotti, J.) (dismissing federal and New Jersey RICO claims and reasoning that "allegations of a single fraudulent scheme designed to deprive a single plaintiff of property does not adequately allege a

RICO violation"); *see Galicki v. New Jersey,* 2016 WL 4950995, at *26 (D.N.J. Sept. 15, 2016) (Linares, J.) (New Jersey RICO claim premised on "a single, overarching scheme" failed to allege pattern of racketeering).

Count 11, then, is dismissed, and because Grant has failed to allege the basic elements of a New Jersey RICO claim, the Court finds it unlikely that amendment would salvage it.  *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (leave to amend need not be granted where amendment "would be inequitable or futile"); *see also Galicki*, 2016 WL 4950995, at *25 (dismissing New Jersey RICO claim with prejudice where complaint "fail[ed] to sufficiently establish a pattern of racketeering activity" and suffered from other deficiencies). Accordingly, dismissal is with prejudice.

### h.  Count 12: Unjust Enrichment

Finally, defendants move to dismiss the unjust enrichment claim as against Michael and Synthetic only, arguing that Grant has pleaded a claim for breach of contract and quasi-contract claims do not lie when an enforceable contract exists between the parties, as Grant has pled here. It is, however, well established that pleading in the alternative is permissible.  *See, e.g.*, *Simonson v. Hertz Corp.*, 2011 WL 1205584, at *6 (D.N.J. Mar. 28, 2011) (Hillman, J.) (citing various authority).  Particularly relevant here, "[w]hile a plaintiff may not recover on both a breach of contract claim and an unjust enrichment claim, [it] may plead alternative and inconsistent legal causes of action arising out of the same facts."  *Id.*  Accordingly, the unjust enrichment claim will not be dismissed at this stage as duplicative.

**IV.     Conclusion**

For the foregoing reasons, defendants' motion (D.E. 7) is granted in part and denied in part.

An appropriate order will issue.

/s/ Katharine S. Hayden

Date: June 30, 2022                                    Katharine S. Hayden, U.S.D.J.